POMERANTZ LLP
Thomas H. Przybylowski
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
tprzybylowski@pomlaw.com

*Attorney for Plaintiff*

- additional counsel on signature page -

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| VIJAY PATEL, Individually and on Behalf of All Others Similarly Situated, | Case No. |
| Plaintiff, | |
| v. | <u>CLASS ACTION COMPLAINT</u> |
| COINBASE GLOBAL, INC., BRIAN ARMSTRONG, and ALESIA J. HAAS, | <u>JURY TRIAL DEMANDED</u> |
| Defendants. | |

Plaintiff Vijay Patel ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's

attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Coinbase Global, Inc. ("Coinbase" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Coinbase securities between April 14, 2021 and July 26, 2022, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      Coinbase provides financial infrastructure and technology products and services for the cryptocurrency economy (or "cryptoeconomy") in the U.S. and internationally. The Company purportedly offers the primary financial account in the cryptoeconomy for retailers, a marketplace with a pool of liquidity for

transacting in crypto assets for institutions, and technology and services that enable ecosystem partners to build crypto-based applications and securely accept crypto assets as payment.

3.    Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and compliance policies.   Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Coinbase custodially held crypto assets on behalf of its customers, which assets Coinbase knew or recklessly disregarded could qualify as the property of a bankruptcy estate, making those assets potentially subject to bankruptcy proceedings in which Coinbase's customers would be treated as the Company's general unsecured creditors; (ii) Coinbase allowed Americans to trade digital assets that Coinbase knew or recklessly disregarded should have been registered as securities with the SEC; (iii) the foregoing conduct subjected the Company to a heightened risk of regulatory and governmental scrutiny and enforcement action; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

4.    On May 10, 2022, in its quarterly report for the first quarter of 2022, released after the markets closed, Coinbase disclosed that: "[B]ecause custodially held crypto assets may be considered to be the property of a bankruptcy estate, in the event of a bankruptcy, the crypto assets we hold in custody on behalf of our

3

customers could be subject to bankruptcy proceedings and such customers could be treated as our general unsecured creditors."

5.      Following this disclosure, the price of Coinbase's Class A common stock fell $19.27 per share, or 26.4%, to close at $53.72 per share on May 11, 2022.

6.      In a subsequent tweet commenting on the disclosure, Coinbase's Chief Executive Officer ("CEO"), Defendant Brian Armstrong ("Armstrong"), stated: "We should have updated our retail terms sooner, and we didn't communicate proactively when this risk disclosure was added. My deepest apologies, and a good learning moment for us as we make future changes."

7.      On May 12, 2022, Professor Adam J. Levitin, a professor of law, at Georgetown University Law Center, published a draft of an article entitled "Not Your Keys, Not Your Coins: Unpriced Credit Risk in Cryptocurrency," set to appear in the *Texas Law Review*, which argues that in the event a cryptocurrency exchange files for bankruptcy, bankruptcy courts are likely to deem custodial holdings of cryptocurrencies to be property of the bankrupt exchange, rather than the property of its customers.

8.      Then, on July 25, 2022, after the markets closed, *Bloomberg* reported that Coinbase is facing an SEC probe into whether it improperly let Americans trade digital assets that should have been registered as securities.

4

9. On this news, the price of Coinbase's Class A common stock fell $14.14 per share, or 21.08%, to close at $52.93 per share on July 26, 2022.

10. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

11. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

12. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

13. Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Pursuant to Coinbase's most recently filed Quarterly Report with the SEC, there were 173,706,582 shares of the Company's Class A common stock outstanding.  Coinbase's Class A common stock trades on the Nasdaq Global Select Market ("NASDAQ").  Accordingly, there are presumably hundreds, if not thousands, of investors in Coinbase's Class A common stock located within the U.S., some of whom undoubtedly reside in this Judicial District.

14.   In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

15.   Plaintiff, as set forth in the attached Certification, acquired Coinbase securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

16.   Defendant Coinbase is a Delaware corporation.  According to its SEC filings, Coinbase is a "remote-first" company and, accordingly, does not maintain a headquarters. Coinbase's Class A common stock trades in an efficient market on the NASDAQ under the trading symbol "COIN".

17.   Defendant Armstrong has served as Coinbase's CEO and a Director of the Company at all relevant times.

18.   Defendant Alesia J. Haas ("Haas") has served as Coinbase's Chief Financial Officer at all relevant times.

19.   Defendants Armstrong and Haas are sometimes referred to herein as the "Individual Defendants."

20.   The Individual Defendants possessed the power and authority to control the contents of Coinbase's SEC filings, press releases, and other market

communications.   The Individual Defendants were provided with copies of Coinbase's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Coinbase, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.   The Individual Defendants are liable for the false statements and omissions pleaded herein.

21.    Coinbase and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

22.    Coinbase provides financial infrastructure and technology products and services for the cryptoeconomy in the U.S. and internationally.  The Company purportedly offers the primary financial account in the cryptoeconomy for retailers, a marketplace with a pool of liquidity for transacting in crypto assets for institutions, and technology and services that enable ecosystem partners to build crypto-based applications and securely accept crypto assets as payment.

23.     On February 25, 2021, Coinbase filed a registration statement on Form S-1 with the SEC in connection with its public offering of Class A common stock on the NASDAQ (the "Offering"), which, after amendments, was declared effective by the SEC on April 1, 2021 (the "Registration Statement").

24.     On April 14, 2021, Coinbase filed a prospectus on Form 424B4 with the SEC in connection with the Offering, which incorporated and formed part of the Registration Statement (collectively, the "Offering Documents").

**Materially False and Misleading Statements Issued During the Class Period**

25.     The Class Period begins on April 14, 2021, the day when Coinbase's Class A common stock began publicly trading on the NASDAQ via a direct listing pursuant to materially false and misleading statements and omissions contained in the Offering Documents.  For example, a letter from Defendant Armstrong in the Offering Documents stated, in relevant part:

**A Safe, Trusted, and Easy-to-Use Platform**

Coinbase is building the infrastructure to power the cryptoeconomy, helping bring the benefits of this new technology to the world. Today, you could think of our products as a safe and easy-to-use platform to buy, sell, store, save, spend, and use cryptocurrency. But for many of our customers, they simply think of us as their primary financial account in the cryptocurrency. Coinbase is building a portfolio of different products and services that connect to this primary financial account, and we're enabling third party products and services to be connected as well. We seek to make all of our products and services the most trusted and easiest to use in the industry.

Trust is critical when it comes to storing money. From the early days, we decided to focus on compliance, reaching out to regulators proactively to be an educational resource, and pursuing licenses even before they were needed. We invested heavily in cybersecurity, built novel key storage mechanisms, and obtained a cybercrime insurance policy. We even developed ways for customers to custody their own cryptocurrency safely, so they didn't need to trust us at all. Most importantly, we built a culture that doesn't take shortcuts or try to make a quick buck.

26.     Further, in providing an overview of the Company, the Offering Documents stated, in relevant part:

We power the cryptoeconomy by combining the best of both emerging blockchain technology and traditional finance to create trusted and easy-to-use products for the industry. We have built a robust backend technology platform to support the global, real-time, and 24/7/365 demands of crypto asset markets. We invest heavily in regulatory compliance by working with regulators around the world to shape policy, and have pioneered industry-leading security practices for safeguarding crypto assets. Our early focus on trust and usability has allowed us to become the primary on-ramp to the cryptoeconomy from the fiat-based financial system.

*** 

Today, we directly integrate with over 15 blockchain protocols, ***support over 90 crypto assets for trading or custody***, and offer a suite of subscription products and services that have enhanced the customer value proposition and power of our platform. Retail users are now engaging with multiple products — across the four quarters ended December 31, 2020, on average, 21% of retail users who invested also engaged with at least one non-investing product per quarter. When retail users invested and engaged with at least one non-investing product, we saw average net revenue per retail user increase by approximately 90%. Although subscription products and services do not currently contribute a significant portion of net revenue relative to our trading business, we experienced 126% annual growth in revenue from these products and services from 2019 to 2020. We are committed

9

to growing more stable revenue from subscription products and services, and expect that they will contribute a larger portion of our total revenue over time as our customers connect with the broader cryptoeconomy.

(Emphasis added.)

27.     Additionally, in a section entitled "What Sets us Apart," the Offering Documents stated the following, in relevant part, regarding crypto assets held in custody by the Company:

***We have significant scale, securely storing over $90 billion in total assets and we grow with our customers***

Customers that start their journeys with us by investing and storing, grow with us as they experience the benefits of the open financial system by spending, staking, lending, borrowing, and earning various crypto assets through Coinbase.

As of December 31, 2020, ***we stored and custodied over $90 billion in total fiat and crypto assets on behalf of our customers***. The total value of crypto assets on our platform represented approximately 11.1% of the total market capitalization of crypto assets as of December 31, 2020, an increase from 8.3% and 4.5% as of December 31, 2019 and December 31, 2018, respectively. In addition, since inception, our customers have traded over $456 billion on our platform. Secure storage and investing serve as the bedrock of a customer's relationship with the cryptoeconomy. We believe our market leading share of assets on our platform is a competitive advantage, and that we have a substantial opportunity to build on our customer relationships by growing with our customers and offering a broader suite of products and services.

Our millions of customers also makes us a desirable partner for companies in our ecosystem such as asset issuers, developers, and merchants, that want to find and build relationships with our retail users and institutions. This enables us to form favorable partnerships that underpin a subset of our products.

10

(Emphasis added.)

28.    Next,    in    describing    the    Company's    risk    factors,    the    Offering
Documents stated the following, in relevant part, regarding crypto assets held in
custody by the Company:

> As of December 31, 2020, we held $90 billion in ***custodial*** fiat
> currencies and cryptocurrencies on behalf of customers. Supported
> crypto assets are not insured or guaranteed by any government or
> government agency. We have also entered into partnerships with third
> parties, such as with the Centre Consortium, as the chief reseller of
> USD Coin, ***where we or our partners receive and hold funds for the
> benefit of our customers***. Our and our partners' abilities to manage and
> accurately safeguard these customer assets requires a high level of
> internal controls. As our business continues to grow and we expand our
> product and service offerings, we must continue to strengthen our
> associated internal controls and ensure that our partners do the same.
> Our success and the success of our offerings requires significant public
> confidence in our and our partners' ability to properly manage
> customers' balances and handle large and growing transaction volumes
> and amounts of customer funds. In addition, we are dependent on our
> partners' operations, liquidity, and financial condition for the proper
> maintenance, use, and safekeeping of these customer assets. Any failure
> by us or our partners to maintain the necessary controls or to manage
> customer crypto assets and funds appropriately and in compliance with
> applicable regulatory requirements could result in reputational harm,
> significant financial losses, lead customers to discontinue or reduce
> their use of our and our partners' products, and result in significant
> penalties and fines and additional restrictions, which could adversely
> impact our business, operating results, and financial condition.
>
> We deposit, transfer, and ***custody*** customer cash and crypto
> assets in multiple jurisdictions. In each instance, we are required to
> safeguard customers' assets using bank-level security standards
> applicable to our hot and cold wallet and storage systems, as well as our
> financial management systems related to such custodial functions.

(Emphasis added.)

29.    Finally, with respect to regulatory compliance, the Offering Documents stated, in relevant part:

> The laws and regulations to which we are subject, including those pertaining to digital assets and crypto assets, are rapidly evolving and increasing in scope. Therefore, we monitor these areas closely and invest significant resources in our legal, compliance, product, and engineering teams to ensure our business practices evolve to help us comply with the current laws, regulations, and legal standards to which we are subject, as well as to plan and prepare for changes in interpretations thereof, as well as additional laws, regulations and legal standards that are introduced in the future.

30.    On May 13, 2021, Coinbase published a shareholder letter to discuss the Company's Q1 2021 results (the "Q1 2021 Shareholder Letter"). The Q1 2021 Shareholder Letter stated, in relevant part:

> Our strong Q1 2021 results reflect the strength of the crypto price cycle we entered in Q4 2020. We saw many crypto assets reach all time high prices, high levels of volatility, and increased interest across the entire cryptoeconomy. Crypto market capitalization reached nearly $2 trillion at the end of Q1 2021 compared to $782 billion at the end of Q4 2020. By the end of Q1, the price of Bitcoin had nearly doubled to approximately $59,000 compared to the end of 2020, and the price of Ethereum more than doubled during this same period to approximately $1,900. This market environment drove strong engagement with the Coinbase platform, reflected in retail, institutional and ecosystem partner growth across all key metrics including our Verified Users, retail Monthly Transacting Users (MTUs), Trading Volume, and Assets on Platform.

> At the same time, we continued to see our growth flywheel in action. First, more participants than ever entered the cryptoeconomy in Q1. We now have over 56 million Verified Users, including more than 8,000 institutions, and over 134,000 ecosystem partners on our platform. Retail MTUs grew to 6.1 million in Q1 2021, more than double compared to Q4 2020. Second, we expanded the breadth and depth of

the assets that we support. We added support for 7 new assets to trade and 13 new assets to custody. Adding support for new assets is an important driver of growth of Trading Volume and Assets on Platform. Lastly, we continued to launch innovative products that attracted new customers and deepened relationships with existing ones. For example, in Q1 we acquired Bison Trails--now part of our Coinbase Cloud offering--that will allow companies to send and store crypto, accept crypto payments, and build their businesses with crypto-native infrastructure.

*** 

Trading Volume for the first quarter of 2021 was $335 billion, of which approximately $120 billion was retail and $215 billion was institutional. A significant portion of our Trading Volume was concentrated in Bitcoin and Ethereum at 39% and 21%, respectively. Compared to Q4 2020, Ethereum trading volume increased as a percentage of total Trading Volume, driven in part from an increase in institutional interest. Other factors that may have led to an increase in demand for Ethereum include strong interest in user desire to own our Ethereum 2.0 staking product, which launched in April 2021, and the growth in DeFi where Ethereum is one of the important underlying assets. Trading in other crypto assets comprised 40% of first quarter trading volume, reflecting broadening consumer and institutional adoption of a greater number of crypto assets. ***As of March 31, 2021, we supported 108 unique crypto assets on our platform for trading and custody, up from 90 at the end of 2020.***

(Emphasis added.)

31.     On August 10, 2021, Coinbase published a shareholder letter to discuss the Company's Q2 2021 results (the "Q2 2021 Shareholder Letter").  The Q2 2021 Shareholder Letter stated, in relevant part:

[. . .] we are seeing a growing number of customers leveraging our infrastructure as they create their own crypto offerings. These include traditional banks, asset managers, and fintechs that are seeking best in class capabilities in custody with a crypto-native partner that offers

13

strong security and a trusted brand. Overall, we are excited by our increasing momentum with institutions and the opportunity to grow our presence with this community over time.

***

Throughout Q2, we continued to enhance the depth and breadth of the assets we support. We want to treat asset issuers as the important customers they are and empower our users to make their own risk-adjusted decisions. Overall, we executed well against this goal as we added 29 new assets for trading and 39 new assets for custody during the first six months of 2021. ***In Q2 alone, we added more assets for trading than we added in all of 2020. We currently support 83 assets for trading and 142 for custody***. The addition of more assets is helping to drive diversification in the assets our customers are transacting in.

***

**Custody**
Custodial fee revenues grew to $31.7 million in Q2, up 35% compared to Q1. Our track record of keeping assets safe while operating at scale has been enabled by a multi-year investment in segregated cold storage that is built on a principled approach to security. Our product was also designed to meet regulatory and compliance requirements — a key decision criteria for many of our clients — while still offering an intuitive experience that supports institutional workflows.

(Emphasis added.)

32.     That same day, Coinbase hosted an earnings call with investors and analysts to discuss the Company's Q2 2021 results (the "Q2 2021 Earnings Call"). During the Q&A portion of the Q2 2021 Earnings Call, when asked how the Coinbase product evolves over time, Defendant Armstrong responded, in relevant part:

People not only trust us to do custody and store crypto assets, but we also have our Prime brokerage products integrated, so they have the full suite of products there in terms of our smart order router, which connects into more than 10 venues to get the best liquidity. We also have a number of products -- services for them like post-trade credit. If they want to do staking on these assets and earn yield, or if they want to participate in the governance of some of these blockchains. These are all features that our institutional customers ask for.

*** 

It's taking all those difficult things that we've had to build that I mentioned, [Indiscernible], blockchains, and transaction monitoring, and custody, and everything, and exposing those through APIs in a way that any third-party can actually build on top of those services, those APIs to get to market faster. And we're seeing interest from a number of those financial service players, for instance. And so, I think that we may have an opportunity to actually create a big business out of that as more and more people enter the space and not have it just be truly competitive.

33.    On November 9, 2021, Coinbase published a shareholder letter to discuss the Company's Q3 2021 results (the "Q3 2021 Shareholder Letter").  The Q3 2021 Shareholder Letter stated, in relevant part:

Our strategy to list all legal assets helps give our customers more choice and deepen their engagement with the cryptoeconomy. ***In Q3, we accelerated our pace of asset additions, adding 30 new assets for trading plus an additional 19 assets for custody. At the end of Q3, we supported 103 assets for trading and 158 assets for custody on our platform***. Trading volume from Other Crypto Assets comprised 59% of our total volume in Q3, up from 50% in Q2. This compares to Other Crypto Assets comprising approximately 42% of the total crypto market capitalization as of September 30, 2021. We continue to invest in our asset review process, including automation and related tooling to drive faster asset addition.

(Emphasis added.)

34.   That same day, Coinbase hosted an earnings call with investors and analysts to discuss the Company's Q3 2021 results (the "Q3 2021 Earnings Call"). During the Q&A portion of the Q3 2021 Earnings Call, when asked how crypto exchange-traded funds were affecting Coinbase, Defendant Haas responded in relevant part:

> So about the bitcoin ETF, and we think that it will benefit trading volumes just broadly. [. . .] If there's some institutions that don't have the ability to invest in underlying spot. That doesn't mean it's a different market, so crypto stock market is 24/7 global, there's never a dull moment in them. But in these cases, obviously the bitcoin, each kiosks will also benefit about our stock market and ***we have the ability to provide custody solutions*** and are actively having conversations that how we can support the broader each [. . .] adoption. And while our business today is entirely spot, we do have ambitions of launching a futures trading business in the future and applied for approval to do so in the U.S. So we're excited about the potential for that future growth of our own businesses as well. So in general again, very positive we're excited for the growth of the crypto economy and what that will bring more users into the space.

(Emphasis added.)

35.   On February 24, 2022, Coinbase published a shareholder letter to discuss the Company's Q4 and full year 2021 results (the "Q4 2021 Shareholder Letter").  The Q4 2021 Shareholder Letter stated, in relevant part:

> As part of our strategy to serve as the primary crypto account and give our customers the greatest amount of choice, we want to list all legal assets. Over the course of 2021, we accelerated our asset listing efforts. ***In Q4, we added custody and trading support for 14 and 36 assets, respectively. We ended 2021 with support for 172 assets for custody and 139 assets for trading***.

Looking ahead, we will continue to invest in our asset review process, including expanding our team, improving automation and tooling, and emphasizing our rigorous process where we evaluate security, legality, and compliance.

\*\*\*

Custodial fee revenue was $49.6 million in Q4, up 58% from Q3. The primary factor driving the sequential increase was higher average crypto asset prices in Q4 compared to Q3. In addition, we continued to see billions of dollars of net inflows from new customers. On a full-year basis, we generated $136.3 million of Custodial fee revenue in 2021, up from $18.6 million in 2020. ***We added custody support for 72 assets throughout 2021 and more than doubled our custody customers in 2021 as more and more institutions choose Coinbase for our best-in-class storage solutions***.

\*\*\*

***The first pillar of our strategy is crypto as an investment. To expand our core investing business, we are focused on increasing access to crypto by integrating with more fiat payment rails and payments partnerships as well as supporting more assets for trading and custody***. We are excited to expand support for Layer 2 blockchains and think this is an important area of growth for the cryptoeconomy. Layer 2 blockchains build on top of native protocols, enabling faster, lower-cost crypto-to-crypto transactions. Coinbase is building tools to facilitate Layer 2 transactions that will enable users to interact more seamlessly across decentralized apps and Web3.

(Emphasis added.)

36.     On February 25, 2022, Coinbase filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operational results for the quarter and year ended December 31, 2021 (the "2021 10-K"). The 2021 10-K contained substantively similar statements as referenced in ¶¶ 25-29, *supra*,

regarding crypto assets held in custody by the Company and the Company's regulatory compliance.

37.    In addition, the 2021 10-K asserted the following, in relevant part, regarding Coinbase's purported system of controls and policies to prevent the unregistered sale of securities on its platform:

> We have policies and procedures to analyze whether each crypto asset that we seek to facilitate trading on our platform could be deemed to be a "security" under applicable laws. Our policies and procedures do not constitute a legal standard, but rather represent our company-developed model, which permits us to make a risk-based assessment regarding the likelihood that a particular crypto asset could be deemed a "security" under applicable laws [. . .] [W]e only permit trading on our core platform of those crypto assets for which we determine there are reasonably strong arguments to conclude that the crypto asset is not a security. We believe that our process reflects a comprehensive and thoughtful analysis and is reasonably designed to facilitate consistent application of available legal guidance to crypto assets to facilitate informed risk-based business judgment [. . .] We expect our risk assessment policies and procedures to continuously evolve to take into account case law, facts, and developments in technology.

38.    Appended to the 2021 10-K as exhibits were signed certifications pursuant to the Sarbanes-Oxley Act of 2022 by the Individual Defendants, attesting that "[t]he information contained in the [2021 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

39.    The statements referenced in ¶¶ 25-38 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations,

and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Coinbase custodially held crypto assets on behalf of its customers, which assets Coinbase knew or recklessly disregarded could qualify as the property of a bankruptcy estate, making those assets potentially subject to bankruptcy proceedings in which Coinbase's customers would be treated as the Company's general unsecured creditors; (ii) Coinbase allowed Americans to trade digital assets that Coinbase knew or recklessly disregarded should have been registered as securities with the SEC; (iii) the foregoing conduct subjected the Company to a heightened risk of regulatory and governmental scrutiny and enforcement action; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

### The Truth Emerges

40. On May 10, 2022, in its quarterly report for the first quarter of 2022, released after the markets closed, Coinbase disclosed the following new bankruptcy-related risk factor:

> ***Our failure to safeguard and manage our customers' fiat currencies and crypto assets could adversely impact our business, operating results, and financial condition.***
>
> As of March 31, 2022, we held $256 billion in custodial fiat currencies and cryptocurrencies on behalf of customers. Supported crypto assets are not insured or guaranteed by any government or government agency. We have also entered into partnerships with third parties, such as with the Centre Consortium, as a reseller of USDC, where we or our partners receive and hold funds for the benefit of our customers. Our

and our partners' abilities to manage and accurately safeguard these customer assets requires a high level of internal controls. As our business continues to grow and we expand our product and service offerings, we must continue to strengthen our associated internal controls and ensure that our partners do the same. Our success and the success of our offerings requires significant public confidence in our and our partners' ability to properly manage customers' balances and handle large and growing transaction volumes and amounts of customer funds. In addition, we are dependent on our partners' operations, liquidity, and financial condition for the proper maintenance, use, and safekeeping of these customer assets. Any failure by us or our partners to maintain the necessary controls or to manage customer crypto assets and funds appropriately and in compliance with applicable regulatory requirements could result in reputational harm, litigation, regulatory enforcement actions, significant financial losses, lead customers to discontinue or reduce their use of our and our partners' products, and result in significant penalties and fines and additional restrictions, which could adversely impact our business, operating results, and financial condition. ***Moreover, because custodially held crypto assets may be considered to be the property of a bankruptcy estate, in the event of a bankruptcy, the crypto assets we hold in custody on behalf of our customers could be subject to bankruptcy proceedings and such customers could be treated as our general unsecured creditors. This may result in customers finding our custodial services more risky and less attractive and any failure to increase our customer base, discontinuation or reduction in use of our platform and products by existing customers as a result could adversely impact our business, operating results, and financial condition.***

(Emphasis added.)

41.     Following this disclosure, the price of Coinbase's Class A common stock fell $19.27 per share, or 26.4%, to close at $53.72 per share on May 11, 2022.

42.     In a subsequent tweet commenting on the disclosure, Defendant Armstrong stated: "We should have updated our retail terms sooner, and we didn't

communicate proactively when this risk disclosure was added. My deepest apologies, and a good learning moment for us as we make future changes."

43.     On May 12, 2022, Professor Adam J. Levitin, a professor of law, at Georgetown University Law Center, published a draft of an article entitled "Not Your Keys, Not Your Coins: Unpriced Credit Risk in Cryptocurrency," set to appear in the *Texas Law Review*, which argues that in the event a cryptocurrency exchange files for bankruptcy, bankruptcy courts are likely to deem custodial holdings of cryptocurrencies to be property of the bankrupt exchange, rather than the property of its customers.  The abstract of the July 8, 2022 draft of the article stated, in relevant part:

> Cryptocurrency exchanges play a key role in the cryptocurrency ecosystem, serving not only as central marketplaces for buyers and sellers to trade, but also as custodians for their customers' cryptocurrency holdings. Exchanges, however, are thinly regulated for safety-and-soundness and face major insolvency risks from their own proprietary investments and hacking. This Article considers what would happen to customers' custodial holdings if a cryptocurrency exchange in the United States were to fail.
>
> Any custodial relationships can potentially be characterized as a debtor-creditor relationship between the custodian and customer, rather than an entrustment or bailment of property. U.S. law gives substantial protection to the custodial holdings of securities, commodities, or cash deposits by securities or commodities brokers or banks. No such regime exist, however, for custodial holdings of cryptocurrencies. Instead, bankruptcy courts might well deem the custodial holdings to be property of the bankrupt exchange, rather than of its customers. If so, the customers would merely be general unsecured creditors of the exchange, entitled only to a pro rata distribution of the exchange's residual assets after any secured or priority creditors had been repaid.

And, even if the holdings were ultimately deemed property of the customers, however, the customers would still experience extended disruption to their access to their holdings.

44.     Then, on July 25, 2022, after the markets closed, *Bloomberg* published

an article entitled "Coinbase Faces SEC Probe on Crypto Listings; Shares Tumble."

The article stated, in relevant part:

> Coinbase Global Inc. is facing a US probe into whether it improperly let Americans trade digital assets that should have been registered as securities, according to three people familiar with the matter. The company's shares dropped 21%.
>
> The US Securities and Exchange Commission's scrutiny of Coinbase has increased since the platform expanded the number of tokens in which it offers trading, said two of the people, who asked not to be named because the inquiry hasn't been disclosed publicly. The probe by the SEC's enforcement unit predates the agency's investigation into an alleged insider trading scheme that led the regulator last week to sue a former Coinbase manager and two other people.
>
> "We are confident that our rigorous diligence process -- a process the SEC has already reviewed -- keeps securities off our platform, and we look forward to engaging with the SEC on the matter," Chief Legal Officer Paul Grewal said on Twitter. The SEC declined to comment.
>
> The drumbeat in Washington for US regulators to do more to oversee crypto has grown louder as digital currencies have tumbled from all-time highs, erasing hundreds of billions of dollars in market value. SEC Chair Gary Gensler has homed in on trading platforms and argued that they should do more to protect retail investors.
>
> As the largest US trading platform, Coinbase lets Americans trade more than 150 tokens. If those products were deemed securities, the firm could need to register as an exchange with the SEC. Coinbase shares fell $14.14 to $52.93 in New York, leaving the stock down 79% this year.

Coinbase has repeatedly sparred with the agency over how it oversees the industry, and the firm last week called on the SEC to propose clearer rules. Meanwhile, after taking a relatively cautious approach for years, Coinbase has boosted its token offerings.

Tensions bubbled up further July 21 when the SEC accused one of the company's former employees of violating its insider-trading rules by leaking information to help his brother and a friend buy tokens just before they were listed on the platform. While the agency didn't allege wrongdoing by Coinbase, the SEC said it had determined that nine of the dozens of digital tokens the men traded were securities -- including seven the exchange says it lists.

Federal prosecutors in Manhattan also charged the three men with wire fraud conspiracy and wire fraud.

45.    On this news, the price of Coinbase's Class A common stock fell $14.14 per share, or 21.08%, to close at $52.93 per share on July 26, 2022.

46.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## **PLAINTIFF'S CLASS ACTION ALLEGATIONS**

47.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Coinbase securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.   Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families

and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

48.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Coinbase securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Coinbase or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

49.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

50.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

51.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Coinbase;

- whether the Individual Defendants caused Coinbase to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Coinbase securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

52.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

53.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Coinbase securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Coinbase securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

54.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

55.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

## (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

56.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

57.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

58.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Coinbase securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Coinbase securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan

and course of conduct, Defendants, and each of them, took the actions set forth herein.

59.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Coinbase securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Coinbase's finances and business prospects.

60.     By virtue of their positions at Coinbase, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

61.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Coinbase, the Individual Defendants had knowledge of the details of Coinbase's internal affairs.

62.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Coinbase.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Coinbase's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Coinbase securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Coinbase's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Coinbase securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

63.     During the Class Period, Coinbase securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Coinbase securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Coinbase securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Coinbase securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

64.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

65.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during

the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)

66.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

67.     During the Class Period, the Individual Defendants participated in the operation and management of Coinbase, and conducted and participated, directly and indirectly, in the conduct of Coinbase's business affairs.  Because of their senior positions, they knew the adverse non-public information about Coinbase's misstatement of income and expenses and false financial statements.

68.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Coinbase's financial condition and results of operations, and to correct promptly any public statements issued by Coinbase which had become materially false or misleading.

69.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Coinbase disseminated in the marketplace during the Class Period concerning Coinbase's results of operations.

Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Coinbase to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Coinbase within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Coinbase securities.

70.    Each of the Individual Defendants, therefore, acted as a controlling person of Coinbase.  By reason of their senior management positions and/or being directors of Coinbase, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Coinbase to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Coinbase and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

71.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Coinbase.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.      Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated: August 4, 2022                    Respectfully submitted,

                                         POMERANTZ LLP

                                          */s/ Thomas H. Przybylowski*
                                         Thomas H. Przybylowski
                                         Jeremy A. Lieberman
                                         (*pro hac vice* application forthcoming)
                                         J. Alexander Hood II
                                         (*pro hac vice* application forthcoming)
                                         600 Third Avenue, 20th Floor
                                         New York, New York 10016
                                         Telephone: (212) 661-1100
                                         Facsimile: (917) 463-1044
                                         tprzybylowski@pomlaw.com

jalieberman@pomlaw.com
ahood@pomlaw.com

WOHL & FRUCHTER LLP
Joshua E. Fruchter
(*pro hac vice* application forthcoming)
25 Robert Pitt Drive, Suite 209G
Monsey, NY 10952
Telephone: (845) 290-6818
Facsimile: (718) 504-3773
jfruchter@wohlfruchter.com

*Attorneys for Plaintiff*

# CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.      I, Vijay Patel, make this declaration pursuant to Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act"), as amended by the Private Securities Litigation Reform Act of 1995.

2.      I have reviewed a Complaint against Coinbase Global, Inc. ("Coinbase" or the "Company") and authorize the filing of a comparable complaint on my behalf.

3.      I did not purchase or acquire Coinbase securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.      I am willing to serve as a representative party on behalf of a Class of investors who purchased or otherwise acquired Coinbase securities during the class period, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.      The attached sheet lists all of my transactions in Coinbase securities during the Class Period as specified in the Complaint.

6.      During the three-year period preceding the date on which this Certification is signed, I have not served or sought to serve as a representative party on behalf of a class under the federal securities laws.

7.      I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.      I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.

**Executed** _____
7/27/2022

                    **(Date)**



_____

                    **(Signature)**


Vijay Patel_____

                    **(Type or Print Name)**

**Coinbase Global, Inc. (COIN)**                                          **Vijay Patel**

### List of Purchases and Sales

| Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|
| Purchase | 4/15/2021 | 1 | $348.8500 |
| Purchase | 11/8/2021 | 1 | $357.7700 |